# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ERIC OBERST,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:23-CV-1943-MAB** |
| | ) | |
| **R. MOVAHED, DMD, P.C., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is once again before the Court on the Motion to Dismiss for Lack of Personal Jurisdiction filed by the Hockel Defendants (Docs. 80, 81; *see also* Doc. 92),[1] and Plaintiff Eric Oberst's Motion to Change Venue (Doc. 87). The Court previously requested, and the parties provided, additional briefing as to the permissibility and practicality of severing Plaintiff's claims against the Hockel Defendants and transferring them to the Northern District of California, or in the alternative, whether the Northern District of California could exercise personal jurisdiction over the Movahed Defendants and was a proper venue for Plaintiff's claims against them (Doc. 92; Docs. 93, 94, 95, 98).[2]

---

[1] Defendant Brian J. Hockel, DDS is a dentist licensed to practice in California (Doc. 81-1). Co-defendant Brian Hockel, DDS, P.C. is the California professional corporation under which Dr. Hockel practices (Doc. 81-1). They are collectively referred to in this Order as "the Hockel Defendants."

[2] Defendant Reza Movahed, DMD, is an oral and maxillofacial surgeon licensed to practice in Illinois and Missouri (Doc. 75, para. 3). Co-defendant R. Movahed, DMD, P.C. is the professional corporation under which Dr. Movahed operated a dental office in Missouri known as Movahed OMS (*Id*. at para. 6, 7). Co-defendant Reza Movahed, DMD, LLC is the limited liability corporation under which Dr. Movahed does business as the Mid America Oral Surgery & Implant Center (*Id*. at para. 14, 15). They are collectively referred to in this Order as "the Movahed Defendants."

The Court also requested, and Plaintiff provided, evidence to support the assertions he made in his response to the motion to dismiss as to why this Court should exercise personal jurisdiction over the Hockel Defendants (Doc. 92; Doc. 94). Having reviewed and thoroughly considered the parties' original and supplemental briefs and the evidence submitted as well as the relevant law and all possible outcomes, the Court opts to first address the Hockel Defendants' motion to dismiss for lack of personal jurisdiction (Doc. 80).

## BACKGROUND

The following is taken from the Third Amended Complaint (Doc. 71) and from the affidavits and deposition testimony submitted by the parties in connection with the briefing on the motion to dismiss (Docs. 81, 86, 90, 93–95, 98). All well-pleaded facts alleged in the complaint, as well as facts in the parties' evidentiary submissions, are accepted as true so long as there is no conflict in the facts. *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 393 (7th Cir. 2020); *NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 620 (7th Cir. 2022). If, however, Defendants' evidence conflicts with the complaint or Plaintiff's other submissions, the conflict is resolved in favor of Plaintiff. *Curry*, 949 F.3d at 392; *NBA Props.*, 46 F.4th at 620.

Plaintiff Eric Oberst lives in Indiana, and for years suffered from poor sleep that left him excessively tired during the day (Doc. 71, para. 1, 19 (Third Amended Complaint)). A colleague of Plaintiff's from physical therapy school, Joe Cicinelli, referred him to Dr. Brian Hockel, a dentist who practices airway orthodontics in

California (Doc. 98-1, p. 2 (Oberst depo, p. 55)).[3] In August 2019, Plaintiff travelled to California for a consultation with Dr. Hockel (Doc. 71, para. 20; *see also id.* at para. 13). Dr. Hockel determined that Plaintiff had Upper Airway Resistance Syndrome—a very mild variant of obstructive sleep apnea—and recommended a course of treatment that included expansion of Plaintiff's jaw(s) (Doc. 71, para. 21, 22, 23; *see also* Doc. 90-1, p. 2 and Doc. 94-1, pp. 2–3 (Oberst depo. pp. 61, 63–64)).

About a year later, in August 2020, Plaintiff told Dr. Hockel that he wanted to move forward with surgical expansion (as opposed to dental expansion) (Doc. 90-1, pp. 7–8 (Oberst depo, pp. 69–70)). Dr. Hockel referred Plaintiff to Defendant Dr. Reza Movahed, who is an oral and maxillofacial surgeon licensed to practice in Illinois and Missouri (Doc. 71, para. 3, 23).[4] Dr. Movahed testified at his deposition that he and Dr.

---

[3] Dr. Hockel's webpage indicates that he specializes in airway orthodontics (amongst other things) which aims to improve the structure of the jaw and airway to promote better breathing and overall health. *Brian J. Hockel, DDS*, LIFE DENTAL & ORTHONDONTICS, BRIAN J. HOCKEL, DDS https://lifedentalortho.com/dr-brian-hockel, [https://perma.cc/27FV-GQUZ] (last visited Aug. 12, 2025); *Airway Orthodontics*, https://lifedentalortho.com/services/orthodontics/airway-orthodontics-walnut-creek-ca [https://perma.cc/5UMK-XPHR] (last visited Aug. 12, 2025).

[4] The Hockel Defendants try to dispute Plaintiff's allegation. They say "Plaintiff admits that he was not referred to Dr. Movahed by Dr. Hockel. Instead, Plaintiff sought treatment in Illinois from Dr. Movahed also at the recommendation of his friend, Joe Cicinelli" (Doc. 98, p. 3). Cicinelli is Plaintiff's aforementioned colleague from physical therapy school (Doc. 98-1, p. 2 (Oberst depo, p. 55)). Cicinelli practices in California and maintains a professional relationship with both Dr. Hockel and Dr. Movahed (Doc. 98-1, p. 2, Doc. 98-2, pp. 2–3 (Oberst depo, pp. 55, 70–71)). However, it is not clear to the Court that the evidence the Hockel Defendants cited, which is a passage from Plaintiff's deposition, actually supports their contention. That passage reads as follows:

> Q: Okay. And it looks like you were actually referred to Dr. Movahed *also* by Joe Cicinelli. Did Joe have a relationship with Dr. Movahed, if you know?
>
> A: I think similar to Dr. Hockel, there was a professional relationship there, yeah.

(Doc. 98-2, pp. 2–3) (Oberst depo, pp. 70–71)) (emphasis added).

Hockel had "consistently worked" with Dr. Hockel for years on cases like Plaintiff's (Doc. 94-3, p. 3 (Movahed depo)).[5]

Plaintiff had a consultation with Dr. Movahed in October 2020 (Doc. 71, para. 24). At that time, all of Dr. Movahed's practice occurred at his dental office in Missouri (Movahed OMS) and/or at the surgical center that he owns in Illinois (Mid America Oral Surgery and Implant Center) (Doc. 71, para. 6–8, 14–16; Doc. 95-1, para. 3, 4, 5, 9 (Movahed Affidavit)). Dr. Movahed diagnosed Plaintiff with hypoplasia of both jaws, which his records indicated was "not amenable to orthodontics alone" (Doc. 71, para. 24; Doc. 86-1, p. 2; Doc. 86-2, p. 2) (medical records)). Plaintiff alleged that "after a lengthy discussion and consideration," Dr. Movahed, Dr. Hockel, and Plaintiff collectively decided that "maxillary and mandibular expansion by distraction was the best course of action" (Doc. 71, para. 25; *see also* Doc. 94-1, pp. 6–7 (Oberst depo. pp. 87–88)).[6] More

---

Whether Joe Cicinelli referred Plaintiff to Dr. Movahed was not a question posed to Plaintiff; it was merely an assertion by defense counsel. And Plaintiff did not directly respond to that assertion, let alone affirm it. Furthermore, the use of the word "also" in defense counsel's statement implies that Plaintiff was referred to Dr. Movahed by more than one person, Joe Cicinelli being one and Dr. Hockel presumably the other. Other evidence also suggests that Dr. Hockel played a role in referring Plaintiff to Dr. Movahed. Movahed testified at his deposition that Plaintiff was referred to him "[b]y Dr. Cicinelli and Dr. Hockel" (Doc. 94-3, p. 2). And a passage from Dr. Hockel's medical records, which was read at Plaintiff's deposition, indicates that Dr. Hockel recommended "a consultation with the surgeon, Dr. Movahed" (Doc. 94-1, pp. 2–3, depo. pp. 63–64).

To the extent that a dispute of fact exists as to whether Dr. Hockel referred Plaintiff to Dr. Movahed, the conflict must be resolved in Plaintiff's favor. *Curry,* 949 F.3d at 392; *NBA Props.,* 46 F.4th at 620. The Court thus credits Plaintiff's version of the story.

[5] Movahed was also asked how many times Dr. Hockel had referred a patient to him or vice versa (Doc. 94-3, p. 3). Movahed responded that "most of the referral is done by Dr. Hockel to me" and he provided an estimate as to the number of referrals he had received from Dr. Hockel but that number was cut off from the portion of the deposition transcript provided to the Court (Doc. 94-3, p. 3).

[6] The maxilla is the upper jaw and the mandible is the lower jaw.

specifically, Dr. Movahed would perform the surgery to expand Plaintiff's upper jaw, and then Dr. Hockel would manage the postoperative orthodontics, including an appliance to dentally expand Plaintiff's lower jaw and braces on both the upper and lower jaws (Doc. 71, para. 25; *see also* Doc. 94-1, pp. 4–5, 10 (Eric Oberst depo, pp. 65–66, 96); Doc. 94-2, pp. 5–6, 8–10 (Leah Oberst depo, pp. 38–39, 41–43)).

In April 2021, two months prior to his scheduled surgery, Plaintiff contacted Dr. Hockel because he was having second thoughts about going through with the surgery and was worried about poor outcomes (Doc. 71, para. 26). Dr. Hockel recommended to Plaintiff that he should not change course and should stick with the plan for surgical expansion (*Id.* at para. 27).

On June 14, 2021, Plaintiff went to Dr. Movahed's surgical center in O'Fallon, Illinois for his scheduled surgery (Doc. 71, para. 14–17, 28). During the pre-operative procedures—and after an IV had already been administered—Plaintiff was informed that Dr. Movahed would be doing both upper *and* lower jaw surgery (*Id.* at para. 28; *see also* Doc. 94-1, p. 11 (Oberst depo p. 97); Doc. 94-2, pp. 7–9 (Leah Oberst depo, pp. 40–42)). Plaintiff was confused and panicked because he did not believe that was the surgery he had agreed to (Doc. 94-1, pp. 9–10 (Oberst depo, pp. 96–97); Doc. 94-2, pp. 8–9 (Leah Oberst depo, pp. 41–42)). Plaintiff alleges the change in treatment was decided by Dr. Hockel and Dr. Movahed without any communication to him or his consent (Doc. 71,

para. 28).[7]

Plaintiff had his partner, Leah, contact Dr. Hockel for assurance that the revised
plan was the correct course of action (Doc. 71, para. 29; *see also* Doc. 94-2, pp. 9, 10 (Leah
Oberst depo, pp. 42, 43)). Plaintiff was not going to proceed with the surgery unless Dr.
Hockel agreed with the revised plan (Doc. 94-2, p. 9 (Leah Oberst depo, p. 42)). Dr. Hockel
confirmed that he and Dr. Movahed had jointly decided to alter the previous care plan,
and so Plaintiff went through with the surgery on both jaws (Doc. 71, para. 29; Doc. 86-3,
p. 2 (Oberst depo, p. 104); Doc. 94-2, pp. 9–10 (Leah Oberst depo, pp. 42–43)).

Following surgery, Plaintiff texted pictures of his mouth every day to Dr.
Movahed and Dr. Hockel so that they could monitor his progress and decide when the
expansion had gone far enough (Doc. 94-1, p. 12 (Oberst depo, p. 111)). Plaintiff
communicated his concerns more than once that his appliance was crooked and/or his
jaws were expanding asymmetrically, but Dr. Movahed and Dr. Hockel both waved him
off (Doc. 71, para. 30–34). In August 2021, when Plaintiff was at Dr. Movahed's for
surgery to remove the expanders from his mouth, Dr. Movahed called Dr. Hockel on the
phone and the three men had a short conversation (Doc. 94-1, pp. 13–14, 15 (Oberst depo,
pp. 129–30, 131)).

Plaintiff alleges that ultimately his jaws were over-expanded and expanded
asymmetrically and his upper jaw was malaligned (Doc. 71, para. 35, pp. 6–7 (Count 1),

---

[7] *See also* Doc. 94-1, p. 11 (Oberst depo, p. 97) ("I asked [Dr. Movahed] about the lower jaw pictures and
what that was all about. And his response was, 'I talked to Dr. Hockel. We're going to do this instead of
expanding with the expander Dr. Hockel is going to make. Dr. Hockel's on board. It's going to work.")).

and pp. 10–11 (Count 4); *see also* Doc. 94-1, p. 13 (Oberst depo, p. 129)). He claims that he was "left . . . worse than before his surgery" and his sleep symptoms did not improve at all (Doc. 71, para. 35, pp. 7, 11). He has had to endure additional surgeries and treatment to correct both jaws and his teeth, longer than anticipated recovery time, pain, suffering, and disfigurement (Doc. 71, para. 36, pp. 7, 11).

Plaintiff alleges that Dr. Hockel and Dr. Movahed were negligent because they failed to fully explore non-surgical treatment before recommending surgery (Doc. 71, pp. 6–7, 11). Plaintiff alleges that Dr. Hockel was additionally negligent because he failed to recommend maxilla-mandibular advancement and instead recommended expansion, even though Plaintiff's evaluation revealed hypoplasia of both jaws and not a narrow palate or mandible (Doc. 71, p. 11). In other words, as the Court understands it, Plaintiff is claiming that Dr. Hockel recommended the wrong type of surgery for his condition. Dr. Movahed, on the other hand, recommended maxilla-mandibular advancement but negligently failed to perform it (Doc. 71, pp. 6–7). Plaintiff alleges that Dr. Movahed was additionally negligent in that he failed to properly place the palatal distractor, which resulted in the distractor becoming loose and asymmetric palatal expansion (*Id.*). Finally, Plaintiff alleges that Dr. Movahed and Dr. Hockel were both negligent by recommending and/or allowing continued expansion of both of Plaintiff's jaws beyond the distance that could be corrected with orthodontics alone (*Id.* at pp. 6–7, 11).

## LEGAL STANDARD

Personal jurisdiction is the court's "power to bring a person into its adjudicative process." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014) (quoting BLACK'S

LAW DICTIONARY 930 (9th ed. 2009)). A plaintiff need not allege facts about personal jurisdiction in his or her complaint, but once a defendant moves to dismiss based on the lack of personal jurisdiction, the burden falls on the plaintiff to demonstrate that jurisdiction exists. *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)). Where, as here, the motion is decided based on the parties' written submissions without an evidentiary hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction. *Id.* (citation omitted).

A federal court sitting in diversity, like the Court in this case, "has personal jurisdiction over a nonresident defendant only if a court of the state in which it sits would have jurisdiction." *Purdue Research*, 338 F.3d at 779 (citation omitted). *See also Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 912 (7th Cir. 2015) ("District courts exercising diversity jurisdiction apply the personal jurisdiction rules of the state in which they are located.") (citation omitted). Here, the Illinois long-arm statute "permits its courts to exercise personal jurisdiction up to the limits of the Due Process Clause of the Fourteenth Amendment." *Kipp v. Ski Enter. Corp. of Wis.*, 783 F.3d 695, 697 (7th Cir. 2015) (citing 735 ILCS 5/2-209(c)). Under federal due process standards, a court may exercise personal jurisdiction over an out-of-state defendant if the defendant has "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In other words, the defendant's conduct and connections with the forum "must be such that the defendant 'should reasonably anticipate being haled into court there.'" *Lexington Ins. Co. v. Hotai Ins.*

*Co., Ltd.*, 938 F.3d 874, 878 (7th Cir. 2019) (citation omitted).

Over time, the Supreme Court has recognized two types of personal jurisdiction: general and specific. *Kipp*, 783 F.3d at 697 (citation omitted). As noted in the previous order (Doc. 92), Plaintiff contends only that this Court has specific personal jurisdiction over the Hockel Defendants; general jurisdiction is not at issue (*see* Docs. 86, 94). Specific jurisdiction is "case-linked" and depends on an affiliation between the defendant, the forum, and the underlying controversy. *Walden*, 571 U.S. at 283–84, n.6 (citations omitted). "'The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (quoting *Int'l Shoe*, 326 U.S at 319). Specific personal jurisdiction exists only where (1) the defendant's contacts with the forum state show that it "purposefully availed [itself] of the privilege of conducting business in the forum state or purposefully directed [its] activities at the state" and (2) the suit "arise[s] out of or relate[s] to" the defendant's forum contacts. *B.D.*, 2025 WL 1891817, at *4 (quoting *Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 262 (2017)); *Lexington*, 938 F.3d at 878. The exercise of specific personal jurisdiction must also comport with traditional notions of fair play and substantial justice as required by the Fourteenth Amendment's Due Process Clause. *Lexington*, 938 F.3d at 878.

In evaluating whether a defendant's contacts show that he has purposefully directed his activities at the forum state, [8] the court must focus on the "contacts that the

---

[8] "Whether the nonresident defendant 'purposefully directed' its activities at the forum state" is the language often used in the tort context; "in contract cases, meanwhile, we sometimes ask whether the

'defendant *himself*'" has created with the forum state. *Curry,* 949 F.3d at 396 (quoting

*Burger King,* 471 U.S. at 475) (emphasis in original). "[T]he defendant cannot be 'haled

into a jurisdiction solely as a result of . . . the unilateral activity of another party or a third

person.'" *NBA Props.,* 46 F.4th at 624 (quoting *Burger King*, 471 U.S. at 475). *See also Walden,*

571 U.S. at 286 ("[I]t is the defendant's conduct that must form the necessary connection

with the forum State . . . ."). Additionally, the defendant's contacts with the forum state

must be deliberate and not "random, fortuitous, or attenuated." *NBA Props.,* 46 F.4th at

624 (quoting *Burger King,* 471 U.S. at 475). *Accord B.D.,* 2025 WL 1891817, at *4 ("The

contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'")

(citation omitted). The defendant's contacts also must be with the forum state, not just

with individuals within the state. *NBA Props.,* 46 F.4th at 621 (citing *Walden,* 571 U.S. at

285). In other words, "the plaintiff cannot be the only link between the defendant and the

forum." *Walden,* 571 U.S. at 285. *See also, e.g., Unterreiner v. Pernikoff,* 961 N.E.2d 1, 4 (Ill.

App. Ct. 2011) (holding Missouri physician not subject to personal jurisdiction of Illinois

court where physician's only contact with Illinois was a single follow-up phone call to

patient at her home in Illinois to adjust her medication dosage, and physician was

licensed only in Missouri, operated medical office exclusively in Missouri, never

advertised for patients in Illinois, and plaintiff unilaterally sought out physician and

traveled to Missouri for treatment from him). Importantly, the defendant need not be

---

defendant 'purposefully availed' itself of the privilege of conducting activities or consummating a
transaction in the forum state." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir.
2008).

physically present in the forum state in order to have sufficient minimum contacts. *Curry*,
949 F.3d at 398. Rather, a defendant can purposefully direct their activities at a forum
"'even in the absence of physical contacts' with [the] forum." *Id.* (citing *Burger King*, 471
U.S. at 476).

As for the "arising out of or relating to" element, the point is that there must be
"an adequate connection . . . between the defendant's activities in the forum and the
underlying lawsuit." *B.D.*, 2025 WL 1891817, at *4 (citation omitted). This requirement is
of course satisfied if the defendant's contacts caused the plaintiff's alleged injury. *Id.*
However, "'a strict causal relationship' is not necessary; a defendant's contacts may
'relate to' the lawsuit absent 'proof of causation.'" *Id.* (quoting *Ford*, 592 U.S. at 362).

When it comes to exercising personal jurisdiction over out-of-state physicians,
special rules have evolved. *Kostal v. Pinkus Dermatopathology Laboratory, P.C.*, 827 N.E.2d
1031, 1039 (Ill. App. Ct. 2005) (citing *Kennedy v. Freeman*, 919 F.2d 126, 129 (10th Cir.
1990)). "Generally, 'the tortious rendition of medical services outside the forum state is
not a portable tort that would subject an out-of-state doctor to jurisdiction in the forum.'"
*Allen v. Missouri Baptist Med. Ctr.*, 214 N.E.3d 226, 237 (Ill. App. Ct. 2022) (quoting *Kostal*,
827 N.E.2d at 1040). This rule of thumb is to ensure that jurisdiction is asserted only when
the physician became involved in the forum state "as a result of their intention to do so"
and not just "as a result of the action of their out-of-stat[e] patients." *Kostal*, 827 N.E.2d at
1039 (quoting *Kennedy*, 919 F.2d at 129). The typical case involves a patient who travels to
a foreign state for medical services from a doctor with a local practice and then returns
home to the forum state, where they suffer injury and file suit against the out-of-state

doctor for the services that they sought and received in the doctor's state. *See Kostal*, 827 N.E.2d at 1042. Courts have held that it would be unfair to allow patients to sue in their home jurisdiction for services they sought abroad; instead, they must return to the doctor's state, where the services were rendered, to file suit alleging the services were improper. *Id.* at 1041 (citing *Gelineau v. New York University Hospital,* 375 F.Supp. 661, 667 (D.N.J. 1974)). *Accord Allen*, 214 N.E.3d at 233–34 (quoting *Muffo v. Forsyth*, 345 N.E.2d 149, 152 (Ill. App. Ct. 1976)). However, courts can exercise personal jurisdiction over out-of-state doctors when the doctor has purposefully directed their actions at the forum state and has contacts or activities in the forum state. *Allen*, 214 N.E.3d at 235.

The parties did not cite to a case directly on point with the facts of the instant case (*see* Docs. 81, 86, 90, 93, 94, 95, 98), but the Court found two during the course of its own research that are similar: *Solomon v. Ctr. for Comprehensive Servs., Inc.*, 217 N.E.3d 1079 (Ill. App. Ct. 2023) and *Clemens v. Greenberg*, 224 N.E.3d 762 (Ill. App. Ct. 2022). In both cases, like here, the plaintiff tried to connect a doctor they saw out-of-state to the allegedly negligent medical care that they received in the forum state.

In *Solomon*, the plaintiff sought to connect an Indiana physician to medical care received in Illinois. Specifically, the patient began seeing a neurologist in Indiana, when she was 20 years old, for a traumatic brain injury that she had suffered as a child. *Solomon*, 217 N.E.3d at 1084. While under the neurologist's care, the patient began taking Depakote, which carries a risk of serious birth defects, including spina bifida, if taken during pregnancy. *Id.* at 1084–85. Several years later, the patient's mother discovered a facility in Carbondale, Illinois that offered inpatient brain-injury rehabilitation and

independent living programs. *Id.* at 1086. The mother made the initial contact with the
facility and arrangements for her daughter's admission. *Id.* at 1086, 1092. The medical
director at the facility continued to prescribe Depakote for the patient. *Id.* at 1086. The
patient got pregnant while at the facility and later gave birth to a baby girl who was born
with spina bifida and other health problems. *Id.* at 1087. A lawsuit was filed on the
patient's behalf in Illinois state court against the Illinois facility, and the complaint was
eventually amended to include negligence claims against the Indiana neurologist and his
employer. *Id.* at 1088, 1090.

The appellate court held that specific jurisdiction over the neurologist and his
employer did not exist in Illinois. *Solomon*, 217 N.E.3d at 1092. The neurologist was
licensed in Indiana and his medical office was in Indiana, which is where all of his
contacts with the patient took place. *Id.* He did not target advertising to Illinois residents
or otherwise promote his practice in Illinois. *Id.* He did not have a business relationship
with the Illinois facility. *Id.* He did not refer the patient to the Illinois facility. *Id.* He did
not consult with any of the facility's employees about the patient's admission or her care
while she was there. *Id.* at 1092–93. And he did not treat the patient while she was at the
Illinois facility. *Id.* at 1092. The court held that, based on the facts, the plaintiff did not
establish that the Indiana neurologist and his employer purposefully directed their
activities toward Illinois residents and that the cause of action arose out those
activities. *Id.* at 1093.

In *Clemens*, the plaintiff sought to connect a Wisconsin physician to medical care
received in Illinois. *See Clemens*, 224 N.E.3d at 766–67. The plaintiff started seeing Dr.

Michael Landrum, an infectious disease specialist in Wisconsin, for endocarditis. *Id.* at 765, 766. At some point, the plaintiff told Dr. Landrum that she would be going to Illinois, and he said that he would continue to handle her antibiotic care and management. *Id.* Specifically, Dr. Landrum made a referral to an Illinois nursing agency so that the plaintiff could do her infusion antibiotic treatment in Illinois, he wrote prescriptions to the plaintiff in Illinois, and he received the plaintiff's lab results for monitoring purposes. *Id.* While in Illinois, the plaintiff went to the emergency room with calf pain and was diagnosed with deep vein thrombosis ("DVT"). *Id.* at 764–65, 767. At the behest of the plaintiff's mother, the emergency room physician called Dr. Landrum in Wisconsin to update him on the plaintiff's status. *Id.* at 765, 767. The Illinois physician told Landrum that the plaintiff was in the hospital with a DVT in her leg and that he was going to start her on an anticoagulant. *Id.* at 766, 767. The anticoagulant was then administered to plaintiff and caused a massive brain bleed. *Id.* at 764–65. The plaintiff filed a lawsuit in Illinois state court against the Illinois providers but later amended to add Dr. Landrum and his employer in Wisconsin. *Id.* at 765, 766. The Wisconsin defendants moved to dismiss for lack of personal jurisdiction. *Id.* at 766.

The appellate court held that specific jurisdiction over the Wisconsin defendants did not exist. *Clemens*, 224 N.E.3d at 772. While the plaintiff argued that Landrum treated her while she was in Illinois by referring her to a nursing agency, prescribing antibiotics, and monitoring her lab results, the court pointed out that the plaintiff's lawsuit did not relate to any of that care. *Id.* Rather, the lawsuit related only to the care she received for the DVT in Illinois, and Dr. Landrum did not have a substantial connection to that care.

*Id.* The only act that connected Dr. Landrum to the plaintiff's DVT treatment was the "brief" phone call he received from the Illinois emergency room physician. *Id.* But that phone call was initiated by the plaintiff's mother and the Illinois physician, not Dr. Landrum. *Id.; see also id.* at 767. Furthermore, the call was informational only; Landrum did not provide any input on the treatment plan or review any records, nor was he asked to, and he did not request any additional information. *Id.* at 772. The court noted that not enough information was shared, and Dr. Landrum's participation was too limited, for the call to be considered a consultation. *Id.* "To subject Landrum to personal jurisdiction based on this attenuated connection with Illinois would violate due process." *Id.*

In addition to *Solomon* and *Clemens*, there is another line of cases involving out-of-state pathologists that the Court finds instructive. In these cases, the patient received medical care in their own home state—the forum state, a tissue sample was sent to an out-of-state pathologist for analysis, the pathologist willingly accepted the sample and sent a diagnostic report back to the patient's physician in the forum state, knowing it would be relied upon and used as the basis of the plaintiff's further treatment in the forum state. Courts in Illinois and elsewhere have held that the forum state has personal jurisdiction over the out-of-state pathologist because the doctor "essentially injected himself into the patient's treatment and provided [a] service . . . [that] directly affected the decisions regarding the patient's ongoing treatment in the forum state." *Kostal*, 827 N.E.2d at 1043 (discussing *Kennedy*, 919 F.2d 126, and collecting other cases). This conclusion is further bolstered when the defendant pathologist and the plaintiff's doctor have a prior, ongoing relationship. *Kostal*, 827 N.E.2d at 1044. *See also Solomon*, 217 N.E.3d

at 1092 (considering lack of business relationship or referral history between Indiana physician and Illinois facility in determining Illinois court did not have personal jurisdiction over the non-resident Indiana physician); *Allen*, 214 N.E.3d at 236, 238 (considering lack of business relationship between Missouri physician and Illinois physician in determining Illinois court did not have personal jurisdiction over the non-resident Missouri physician; the relationship between the Missouri physician and the Illinois physician "began with an unsolicited and unilateral phone call from [the] Illinois physician to [the hospital]").

Here, like the illustrative cases discussed above, Plaintiff is seeking to connect an out-of-state dentist, Dr. Hockel, to Illinois. The Hockel Defendants argue that this Court does not have specific jurisdiction over them because they did not purposefully direct their activities at Illinois and they have not formed any contacts with Illinois related in any way to Plaintiff's alleged claims of injury (Doc. 81, pp. 3, 7; Doc. 90, pp. 5–6). Hockel attests that he lives in California, is licensed in California, and maintains an office only in California (Doc. 81-1). His professional corporation was incorporated in California and its principal place of business—Hockel's dental office—is in California (*Id.*). Neither of the Hockel Defendants have ever had an office in Illinois or owned or leased any real property in Illinois, and they do not have any employees in Illinois (*Id.*). The Hockel Defendants point out that it was Plaintiff who called Dr. Hockel's office and made an appointment, not the other way around l (*Id.*). Plaintiff then traveled from his home state of Indiana to California to see Dr. Hockel, and according to Hockel, "all dental services" that he provided to Plaintiff, including his treatment recommendations, "were provided

in the State of California" (Doc. 81, p. 7; Doc. 81-1; Doc. 90, p. 4; Doc. 98, p. 3). Hockel
further contends that he did not motivate Plaintiff's contacts with Dr. Movahed in Illinois
(Doc. 90, pp. 5–6; Doc. 98, pp. 3, 4). And Hockel point out that the text exchange he had
with Plaintiff's partner on the day of Plaintiff's surgery in Illinois was initiated by her
(Doc. 90, pp. 4, 5–6). The Hockel Defendants additionally argue that their alleged acts of
negligence as set forth in the complaint all occurred in California, and therefore Plaintiff's
injuries did not arise out of or relate to Hockel's Illinois-related activities (Doc. 90, p. 4;
*see also* Doc. 98, pp. 2, 3, 4).

The Court, however, is unpersuaded by the Hockel Defendants' arguments in light
of the aforementioned body of caselaw and the principles established therein. There are
several important facts that distinguish the instant case from *Solomon* and *Clemens* and
connect the Hockel Defendants to Illinois and this litigation in a meaningful way
sufficient to support this Court's exercise of specific personal jurisdiction over them.

First, Dr. Hockel has an ongoing business relationship with Dr. Movahed, an
Illinois surgeon, which existed for some number of years before Plaintiff entered the
picture. Over the course of their relationship, Dr. Hockel has referred an unspecified
number of patients to Dr. Movahed, for a surgical consultation and potential surgery in
Illinois. In this instance, Dr. Hockel referred Plaintiff to Dr. Movahed, or at a minimum
played a significant role in Plaintiff deciding to seek treatment in Illinois from Dr.
Movahed. It cannot be said based on the evidence currently before the Court that Plaintiff
unilaterally sought treatment from Dr. Movahed without any regard for the existing
relationship that Dr. Hockel had with Dr. Movahed. As the Hockel Defendants conceded,

and the Court discussed above, there is case law that views a referral from an out-of-state physician to the forum state as a factor that weighs in favor of the forum exercising jurisdiction over the physician (Doc. 90, p. 6) (citing *Curry v. Vencor Hosp.*, 2002 WL 398602, at *4 (N.D. Ill. 2002)).

Moreover, after Dr. Hockel referred Plaintiff to Dr. Movahed, he did not become hands-off. Rather, Dr. Hockel and Dr. Movahed collaborated to create and revise a joint treatment plan for Plaintiff. And a critical component of this joint treatment plan was for Plaintiff to undergo surgery by Dr. Movahed in Illinois.[9] Similar to the pathologists in *Kostal*, who injected themselves into the plaintiff's care in the forum state by providing a diagnosis that would serve as the basis for further treatment, Dr. Hockel injected himself into Plaintiff's care in Illinois by providing input and affirmatively agreeing with the precise surgery that was to be performed by Dr. Movahed in Illinois and the non-surgical care that would follow. *Contra Solomon*, 217 N.E.3d at 1092–93 (Indiana neurologist never consulted with Illinois facility about the care patient was receiving in the facility); *Clemens*, 224 N.E.3d at 772 (Wisconsin physician took only one call from Illinois physician and did not provide any input on the treatment plan or review any records). All of Dr. Hockel's communications with Dr. Movahed about Plaintiff occurred via phone, text, or

---

[9] The Court takes judicial notice that Dr. Hockel touts on his website that he uses a "collaborative care model" in which he "work[s] closely with a handpicked team of specialists," including oral surgeons (like Dr. Movahed), and "coordinates with . . . [the] specialists to create a comprehensive treatment plan." *About Us*, LIFE DENTAL & ORTHONDONTICS, BRIAN J. HOCKEL, DDS, https://lifedentalortho.com/about-us [https://perma.cc/W77E-GU32] (last visited Aug. 12, 2025). *Collaborative Care*, https://lifedentalortho.com/services/collaborative-care/collaborative-care-dentistry-walnut-creek-ca [https://perma.cc/W3XD-TTUS] (last visited Aug. 12, 2025).

email while Movahed was physically in Illinois and/or Missouri (Doc. 95-1, para. 11).

Dr. Hockel also encouraged Plaintiff more than once to go forward with the surgery in Illinois when Plaintiff was having second thoughts. During one of those instances, as well as on other occasions, Dr. Hockel communicated with Plaintiff while Plaintiff was in Illinois, in Dr. Movahed's facility, under Movahed's care. Additionally, Dr. Hockel actively participated in monitoring the outcome of the surgery in Illinois.

Based on these facts, the Court finds that Plaintiff has made a prima facie showing of specific personal jurisdiction over the Hockel Defendants. The Hockel Defendants purposefully directed their activities at Illinois by deliberately establishing and maintaining a business relationship with Dr. Movahed, an Illinois-based surgeon; by intentionally transacting business with Dr. Movahed by referring patients to him in Illinois, including Plaintiff; by collaborating with Dr. Movahed on a joint treatment plan for Plaintiff and offering input as to the surgery that Movahed would perform in Illinois; by communicating with Dr. Movahed in Illinois via calls, emails, and texts to discuss Plaintiff's treatment; and encouraging Plaintiff to consent to the surgery in Illinois.

Furthermore, Plaintiff's cause of action arose out of or related to the Hockel Defendants' contacts with Illinois. This lawsuit is based primarily on Plaintiff's allegedly negligent treatment plan, the surgery that followed in Illinois, and the allegedly negligent post-treatment care Plaintiff received. It is related to Dr. Hockel's contacts with Illinois given that Dr. Hockel played significant role in sending Plaintiff to Illinois to consult with Dr. Movahed; recommended expansion surgery and went on to devise and sign off on a joint treatment plan that included Dr. Movahed performing expansion surgery in Illinois.

Moreover, Dr. Hockel provided assurances to Plaintiff—while Plaintiff was in Illinois for surgery—that he agreed with the revised surgical plan, which is ultimately what convinced Plaintiff to proceed with the surgery rather than call it off. According to Plaintiff, the revised surgical plan was "complicated and ill-advised" (Doc. 86, p. 2). In other words, Dr. Hockel participated in creating, and convincing Plaintiff to authorize an allegedly negligent surgical plan, which Hockel was aware would take place in Illinois (Doc. 86, p. 2).

Finally, the Hockel Defendants do not do not make any argument or present any considerations that this Court's exercise of personal jurisdiction would be unreasonable (*see* Docs. 81, 90, 93, 98). *See B.D.*, 2025 WL 1891817, at *4 (quoting *Burger King*, 471 U.S. at 477). Therefore, the Court need not consider this issue.

For these reasons, the Court concludes that the Hockel Defendants have sufficient minimum contacts with Illinois that they could anticipate being haled into court here and it is fair, just, and reasonable for this Court to exercise specific personal jurisdiction over them.

## CONCLUSION

The motion to dismiss for lack of personal jurisdiction filed by Defendants Brian J. Hockel, DDS and Brian Hockel, DDS, P.C. (Doc. 80) is **DENIED**. This ruling in turn renders Plaintiff's motion to change venue (Doc. 87) **MOOT**.

**IT IS SO ORDERED.**

**DATED: August 13, 2025**

<u>s/ Mark A. Beatty</u>
**MARK A. BEATTY**
**United States Magistrate Judge**